IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In Re:
Barry D. Christopher and                         Case No. 16-4273-JCO
Penny M. Christopher,

    Debtors.

_____

Acceptance Loan Company,

    Plaintiff,

                                                       Adversary Case No. 16-71-JCO

v.

Barry D. Christopher,

    Defendant.

MEMORANDUM OPINION AND ORDER

      This Adversary Proceeding came before the Court on August 17, 2017 for trial on the Complaint filed by Plaintiff, Acceptance Loan Company, LLC. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157, and the order of reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(I), and the Court has authority to enter a final order.

      The Complaint contests the dischargeability of an unsecured debt owed by Debtor to Acceptance Loan under 11 U.S.C. § 523(a)(2)(A). The case was called and the Court heard testimony from Debtor, Barry Christopher, and the Vice President and COO of Acceptance Loan, Matt Dial. The Court found both witnesses to be forthright, honest and credible. Both parties submitted exhibits into evidence without objection. The Court has

considered the record, the evidence and testimony presented, the law, as well as the arguments of the parties and concludes that the debt owed by Debtor to Acceptance Loan is dischargeable for the reasons set out below.

FINDINGS OF FACT

Debtor filed his Chapter 7 petition for relief on December 6, 2016. Creditor Acceptance Loan filed this adversary proceeding on December 29, 2016, alleging that the debt owed to it by Debtor should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The debt arose when, on September 19, 2016, Debtor deposited a live check from Acceptance Loan in the amount of $2,005.75 (hereinafter referred to as the "2016 loan"). According to the testimony of Mr. Dial, the check was sent to Debtor in a "batch" of "live checks" from Acceptance to customers that it had determined were qualified for an extension of credit on a pre-approved basis. Mr. Dial stated that Acceptance utilizes a 24-point criterion to determine the creditworthiness of their customers for additional credit. The process begins with a survey of the Transunion credit histories of approximately 22,000 existing customers. The 24-point criterion is then applied to each customer until the least creditworthy customers are weeded out and only the most suitable customers remain. On this occasion, approximately 1,700-2,000 customers were pre-approved for an extension of credit via live check. Mr. Dial further stated that it is Acceptance's policy not to send pre-approved extensions to new customers, but only to existing customers that exemplify the "ability and good will/intent to pay." Though there was no testimony regarding when Debtor became a customer of Acceptance, it was undisputed that he was not a new customer. Thus, he was one of the

22,000 existing customers that was considered for an unsolicited pre-approved extension of credit.

As an existing customer, Debtor had at least two prior loans with Acceptance before taking out the 2016 loan at issue. These two prior loans were relevant in Acceptance's pre-approval of Debtor. The first loan was for approximately $350.00, which Debtor paid off in full before the loan term ended. The second loan was for approximately $3,028.80, and originated in September of 2015 (the "2015 loan"). The 2015 loan was initiated in the same fashion as the 2016 loan at issue—a batch of pre-approved live checks mailed to qualified customers. As of September 12, 2016, Debtor was still paying on the loan, with a balance of $2,784.00. The minimum monthly payment on the 2015 loan was $112.00. The Debtor testified that he usually paid more than the minimum monthly payment on this loan, and Mr. Dial testified that Debtor had a "perfect" pay history on this loan.

Having considered Debtor's pay history over the course of at least two years, Acceptance reviewed his creditworthiness, applied the 24-point criterion and concluded that Debtor fit the profile to receive the pre-approved extension of credit. The check mailed to Debtor stated on the back of the check,

> NOTICE TO CONSUMER: BY SIGNING AND DEPOSITING (OR CASHING) THIS, YOU HAVE AGREED TO REPAY MONIES AS STATED. DO NOT SIGN THIS BEFORE YOU READ IT AND THE AGREEMENT, OR IF EITHER CONTAINS BLANK SPACES.
> THE UNDERSIGNED ACKNOWLEDGE(S) RECEIPT OF BOTH A COPY OF THE TERMS OF THIS PROMISSORY NOTE AND ARBITRATION AGREEMENT.
> FUTHERMORE, THE UNDERSIGNED CERTIFIES THEY HAVE ABILITY TO REPAY THIS DEBT.

Debtor received the live check in the mail, and deposited it on September 19, 2016. Debtor testified that his wife also received the same offer, but they did not deposit the check mailed to her.

After Debtor deposited the check for the 2016 loan at issue on September 19, 2016, he made no more payments on the 2015 loan, and never made any payments on the 2016 loan at issue. Debtor filed for Chapter 7 relief four months and ten days thereafter.

Debtor testified that he is a disabled veteran and lives on social security disability income and VA benefits. He has been married for 35 years. He has two sons, one of which experienced reoccurring medical issues during the summer and fall of 2016 for which Debtor was financially responsible. He testified that their home has had unexpected plumbing problems over the course of the last few years and experienced a major failure in December 2016 which was not covered by insurance.

Debtor's Schedule E/F, which was admitted into evidence, indicates that he has approximately 14 unsecured accounts totaling $53,074.00 in unsecured debt, the majority of which he testified accrued prior to becoming a customer of Acceptance. The majority of the 14 unsecured debts are less than $6,000.00. Two unsecured debts are somewhat larger, in the amounts of $10,464.82 and $8,631.73 with Citi Card and Discover, respectively. Acceptance is the only creditor that filed a dischargeability complaint against the Debtor.

Debtor testified that he honestly believed for quite some time that he could dig himself out of debt. However, when the home repairs and medical bills began to stack up, his wife began suffering anxiety and stress due to their financial crisis. Debtor

testified that he was embarrassed by his financial situation and that it was difficult to admit that he was in such deep financial trouble.

In October of 2016, Debtor and his wife searched the phone book for a bankruptcy attorney they felt qualified to handle their case. They chose attorney Fran Hollinger and at some point during that month, they consulted with her about filing for relief.

Mr. Dial testified that when a customer defaults on a payment, an Acceptance employee begins making collection calls to the customer. Once the call is over, Mr. Dial stated that the employee enters notes into their system regarding the content of the collection call. In October of 2016, Debtor began receiving collection calls from Acceptance. Mr. Dial read the notes for one particular call into the record.

The note reflects that Debtor stated to the Acceptance employee that he had spoken with attorney Fran Hollinger regarding filing bankruptcy, but that he was unsure of the chapter under which he would file. The call ended and the Acceptance employee performed a PACER search to determine if Debtor had filed for bankruptcy relief. Mr. Dial testified that the note stated there was no record of Debtor having filed for bankruptcy relief. Debtor testified that he did not retain Ms. Hollinger until December of 2016 when he actually filed bankruptcy, and that he did not pay her retainer with any of the funds from the 2016 loan.

For relief, Plaintiff prays that the 2016 loan be excepted from discharge on the grounds that Debtor had the requisite intent to defraud Acceptance Loan by accepting the unsolicited benefits of the live check without ever intending to repay the same. Acceptance also contends that Debtor's actions after accepting the funds constitute

material misrepresentations by Debtor that the loan would be repaid. Debtor disputes these allegations.

Many of the findings of fact necessary to determine the dischargeability of a debt involve the intent of the debtor. Intent is to be determined by reviewing all of the evidence presented and the credibility of the witnesses. Having observed the Debtor during testimony, and evaluating what he said in light of all the other evidence, the Court finds him to be a credible witness. Debtor was forthcoming in his answers and was not evasive.

## CONCLUSIONS OF LAW

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt for money, property, services, or an extension, renewal, or refinancing of credit will not be discharged to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C § 523(a)(2)(A).

In order for a particular debt to be excepted from discharge, a plaintiff must prove by a preponderance of the evidence that the defendant's conduct fits within the exception to discharge. *See Grogan v. Garner,* 498 U.S. 279, 291 (1991). Exceptions to discharge must be strictly construed in order to give effect to the "fresh start" policy of the Bankruptcy Code. *In re Meyer,* 296 B.R. 849, 857 (N.D. Ala. Feb. 25, 2003)(*citing Hope v. Walker,* 48 F3d 1161 (11th Cir. 1995); *Equitable Bank v. Miller,* 39 F.3d 301, 304 (11th Cir. 1994)); *see also In re Wood,* 245 Fed. Appx. 916 (Aug. 21, 2007).

Some Courts have found that the three types of fraud listed in Section 523(a)(2) are inextricably intertwined, such that it is nearly impossible to conceive of a set of

circumstances that would constitute actual fraud, but which would not also constitute false pretenses or false representation, making the analysis of fraud one that overlaps with each of the three types listed. *In re Gilmore,* 221 B.R. 864, 872 (N.D. Ala. June 17, 1998). Thus, a finding of actual fraud would necessitate and subsume a finding of false pretenses and false representations. Other courts have applied the three types of fraud separately because Section 523(a)(2)(A) is written in the disjunctive. *See Matter of Johnson,* 2017 WL 1839159, at *8 (Bankr. N.D. Ala. May 5, 2017)(*citing In re Zeller,* 242 B.R. 84, 87 (Bankr. S.D. Fla. 1999). This Court agrees with the learned Judge Cohen in *Gilmore*, that despite the statute being written in the disjunctive, the analysis of each type of fraud does indeed overlap. Nevertheless, Plaintiff's Complaint does not expressly state which of the three types of fraud occurred, and since the three types of fraud *are* written in the disjunctive in the statute, this Court will analyze each type of fraud separately.

<ins>False Pretenses</ins>

"False pretenses are implied, and includes any intentional fraud or deceit practiced by whatever method in whatever manner." *Matter of Johnson*, 2017 WL 1839159, at *8 (Bankr. N.D. Ala. May 5, 2017). "False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol or token calculated and intended to deceive." *Id.* "It is a series of events, activities or communications which, when considered collectively, create a false sense and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor." *Id.* Silence or concealment as

to a material fact can constitute false pretenses." *Id.*

In the case at hand, this Court finds that Acceptance fails to meet its burden of proof in establishing that Debtor asserted any false pretense in obtaining the funds. First, it bears noting that this pre-approved check was a completely unsolicited extension of credit instigated by Acceptance. Mr. Dial admitted multiple times that Debtor was an attractive candidate for a pre-approved extension of credit. Mr. Dial emphasized Acceptance's policy of never extending such credit to new customers, but only existing customers whose accounts were analyzed through the 24-point-lens and found to be the best of the best. While Acceptance's analysis of its customers' creditworthiness before extending such credit certainly helps its case,[1] doing so does not make Acceptance's lending decision bulletproof. This situation is nothing more than Acceptance independently deciding to take a risk that resulted in the costs outweighing the benefits. Debtor did not induce Acceptance into loaning him money, he merely signed a check and deposited it believing, at that time, he would be able repay it.

Furthermore, Debtor testified unequivocally that a number of unforeseen emergencies occurred in his life causing him to need additional money to cover those expenses. There was no evidence presented that Debtor made any extraordinary purchases with the 2016 or 2015 loan. Instead, Debtor testified that he was in the process of selling or pawning items of value to help ease his financial burden. When considered collectively, the facts surrounding the 2016 loan are insufficient to have induced or

---

[1] Historically, many credit issuers extended offers of pre-approved credit to consumers without doing any due diligence as to the consumer's financial history, employment, and debt to income ratio. *See e.g., In re Fabie,* 1997 WL 34854082 (S.D. Ga. Dec. 19, 1997); *In re Valdes,* 1995 WL 618998 (Bankr. S.D. Fla. Sept. 1, 1995); *In re Shurbier,* 134 B.R. 922 (W.D. Mo. 1991); *In re Merritt,* 1997 WL 375693 (M.D. Fla. May 12, 1997); *In re Acker,* 207 B.R. 12 (M.D. Fla. Feb. 24, 1997).

misled Acceptance into extending credit to Debtor based on false pretenses. Instead, they paint the picture of the classic honest, but unfortunate Debtor deserving of a fresh start. Therefore, this Court finds that Acceptance failed to meet its burden of proof that Debtor accepted the extension of credit under false pretenses.

False Representation

Plaintiff's Complaint contends that Debtor obtained the 2016 loan through representations which he either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentations. (Doc. 1 at 3). A false representation typically requires an express misrepresentation by a debtor to an issuer of credit. *Johnson,* 2017 WL 1839159, at *8. Reckless disregard for the truth can constitute a false representation. *In re Meyer,* 269 B.R. 849 (N.D. Ala. 2003). "The term 'reckless' has been interpreted to be the equivalent of *intentional.*" *In re Booth,* 174 B.R. 619, 623 (Dec. 1, 1994)(emphasis in original). There were no face-to-face communications between Debtor and Acceptance regarding the 2016 loan, so the only issue here is whether Debtor made representations to Acceptance in reckless disregard of the truth of his financial situation. For reasons set forth below, this Court concludes that Debtor did not recklessly disregard his financial difficulties.

Debtor testified that he was keenly aware of his financial difficulties at the time he deposited the check, and in fact, those difficulties were the reason he accepted the extension of credit therein. He testified that the plumbing in his home was in disrepair, and that he needed funds to cover medical care costs for his son. Debtor testified that even though he recognized his finances were tight, he believed he had the ability to repay the 2016 loan when he deposited the check. The Court finds this testimony credible.

Because this Court has found that Debtor believed he had the ability to repay the loan *and* that he intended to repay the loan when he accepted the funds, it follows that he did not make a representation that he knew was false when he accepted the extension of credit. However, to the extent that it is alleged that due to his mounting debts, Debtor engaged in a reckless disregard for the truth regarding his ability to repay the debt, this Court finds that such is not the case. The mere struggle to meet one's monthly bills does not rise to the level of reckless disregard, nor does one's unrealistic optimism in the face of a difficult financial situation. Debtor testified that money was tight for some time prior to accepting the 2016 loan, but that he managed to make monthly payments to pay off the first loan, and was able to make consistent regular monthly payments on the 2015 loan. The fact that his financial circumstances reached an untenable level for his wife soon after he accepted this extension of credit is not probative as to a reckless disregard for the truth.

Debtor's testimony is credible and establishes that he did not recklessly disregard the truth of his financial affairs. Unfounded optimism of one's difficult financial state does not rise to the level of a reckless disregard for the truth. Therefore, this Court finds that Acceptance failed to establish by preponderance of the evidence that Debtor made false representations to Acceptance when he deposited the check.

### Actual Fraud

Actual fraud is determined on a case-by-case basis. *In re Meyer,* 296 B.R. 849, 858 (Bankr. N.D. Ala. 2003). The elements to prove actual fraud under § 523(a)(2)(A) are based on the traditional elements of common law fraud. *In re Meyer,* 296 B.R. at 858. "Thus, to prevail under that section, a creditor must prove that

> (1) the debtor made representations;
> (2) at the time, the debtor knew the representations were false;
> (3) the debtor made the false representations with the purpose and intention of deceiving the creditor;
> (4) the creditor justifiably relied on such representations; and
> (5) the creditor sustained a loss as a result of the representations.

*Id.* (*citing AT & T Universal Card Servs. Corp. v. Reach,* 225 B.R. 236, 239 (Bankr. N.D. Ala.1997)); *see also Field v. Mans,* 516 U.S. 59, (1995); *Am. Express Travel Related Servs. Co. v. McKinnon,* 192 B.R. 768, 771 (Bankr. N.D. Ala.1996). Each factor will be analyzed as it relates to these facts.

<u>Factor One: Debtor's Representations</u>

Credit transactions like the one at hand are contractual agreements by which the debtor agrees to repay the debt incurred in at least minimum specified installments over time and with interest. *Id.* In accepting an extension of credit, a debtor represents only that he intends to abide by the agreement presented with the check, and "has made a false representation only if, at that time the debt is incurred, he intends to breach his agreement." *Id.*

Acceptance asserts that by signing and depositing the check, the Debtor made two representations; one, that he had the ability to repay the loan and, two, that he had the intent to repay the loan. Many courts have held that when credit is extended without the debtor and creditor having any face-to-face interaction, as happened here; the debtor, by accepting the extensions of credit, in this case by signing and depositing the preapproved check and in other cases by using a credit card, represents that he has the intent and the ability to repay the debt so incurred. *Meyer* at 859 (citations omitted). Assuming *arguendo* that the Debtor did make the representations, it is up to this Court to determine if the debtor knew the representations were false.

<u>Factor Two: The Debtor Did Not Make
Representations He Knew Were False</u>

*Ability to Repay*

In the present case, Acceptance contends that by signing the live check, Debtor falsely represented his ability to repay the 2016 loan. Acceptance relies on the boilerplate language on the back of the check, "THE UNDERSIGNED CERTIFIES THEY HAVE THE ABILITY TO REPAY THIS DEBT," to establish this misrepresentation. That contention fails because this Court has found that Debtor believed he had the ability to repay the loan when he accepted the funds.

*Intent to Repay*

There is no evidence that Debtor lacked the *intent* to repay the 2016 loan when he accepted the funds in the live check. As set out in *Meyer,* a debtor "has made a false representation only if, at that time the debt is incurred, he intends to breach his agreement." 296 B.R. 849, 858. Therefore, an extension of credit is "not nondischargeable for 'actual fraud' unless the debtor did not intend to honor the terms of the credit agreement at the time the charges were made or the cash advances were taken." *Id.*

Debtor expressly testified that he believed he could dig himself out of debt. Debtor also testified that his wife, a co-debtor in the underlying Chapter 7 case, received a similar pre-approved extension of credit from Acceptance at the same time, and they chose not to deposit that check. If the Debtor truly had the requisite intent to defraud, the *scienter*, then there would be no reason *not* to deposit his wife's preapproved check as well. The fact that he and his wife began considering bankruptcy 4 months after depositing the 2016 loan is not probative of his intent to repay the loan at the time he

12
Case 16-00071    Doc 20    Filed 09/15/17    Entered 09/15/17 15:56:38    Desc Main
Document      Page 12 of 17

accepted it. He testified that when he accepted the funds offered in the 2016 loan, he intended to repay the money, but began considering bankruptcy due to his wife's anxiety regarding their financial crisis. This Court finds that the existence of financial difficulties does not equate to misrepresentations or the lack of intent to repay, and thus, Acceptance Loan fails to meet its burden of proof on the first element.

<u>Factor Three: Debtor Lacked the Intent to Deceive</u>

This element is satisfied on a case-by-case basis and many courts utilize a twelve-factor test to determine whether a consumer had the requisite intent to deceive when he incurred the debt in issue. Those factors are:

> (1) the length of time between the charges made and the filing of bankruptcy;
> (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
> (3) the number of charges made;
> (4) the amount of the charges;
> (5) the financial condition of the debtor at the time the charges are made;
> (6) whether the charges were above the credit limit of the account;
> (7) did the debtor make multiple charges on the same day;
> (8) whether or not the debtor was employed;
> (9) the debtor's prospects for employment;
> (10) the financial sophistication of the debtor;
> (11) whether there was a sudden change in the debtor's buying habits; and
> (12) whether the purchases were made for luxuries or necessities.

*In re Meyer*, 296 B.R. at 860 n. 14.

First, the time between when the debt was incurred and when Debtor filed for bankruptcy was from September 19 to December 6 of 2016, roughly four months. Four months is not a long time, but also not a short time, and cannot be classified as

*immediately* filing bankruptcy after incurring the debt. Thus, this factor weighs in Debtor's favor.

The second factor also weighs in Debtor's favor. There is no evidence that an attorney was consulted concerning filing bankruptcy before the check was deposited.

Factor three is inapplicable to this case because the debt arises out of an unsolicited extension of credit and not repetitive use of a credit card, and thus, does not weigh for or against Debtor.

Factor four regarding the amount of the charges/debt does not tip the scale in either direction. The check was for $2,005.75. Two thousand dollars is not a large amount but also not inconsequential.

As to factor five, Debtor's financial situation when the debt was incurred, at first weighs against Debtor. While great financial difficulty could lure a debtor into taking out a loan without the intent to repay it, this Court finds that did not happen here. Debtor admitted that his finances were tight and he did not have the liquidity to cover the unexpected home repair costs and medical bills for his son. However, Debtor repeatedly testified that he believed he could, and did intend to repay the 2016 loan. Therefore, even though Debtor's financial situation was a tenuous one, it does not weigh against him.

Factor six regarding Debtor's credit limit is also inapplicable since the debt did not arise from the use of a credit card. There was also no evidence presented regarding Debtor's credit limit with Acceptance.

For factor seven, Debtor testified that though he could not recall exactly what he spent the money on, he was positive it was used to pay household bills, and was not used to pay his bankruptcy attorney's fee. Factor seven weighs in favor of Debtor.

14

Factors eight and nine regarding Debtor's current and future employment are irrelevant as Debtor is a disabled veteran and his monthly income is derived from Social Security disability and VA benefits.

Tenth, little, if any, evidence was adduced as to Debtor's financial sophistication making this factor neither for nor against Debtor.

Eleventh, Debtor received at least two credit extensions prior to the 2016 loan, so his decision to accept this advance does not constitute a sudden change in buying or spending habits.  As one court stated, "[t]here is nothing illegal or improper about [a] cardholder accepting [an] invitation to tide himself over a period of adversity . . . A debtor's expectation that his troubles may be temporary and that his situation will improve enough to permit him to pay his debts may be overly optimistic or unrealistic, especially in the hindsight of bankruptcy, but such behavior without . . . evidencing an intent not to pay the debt incurred should not constitute fraud under section 523(a)(2)(A)." *In re Baker*, 1998 WL 34342251, at *5 (Bankr. E.D. Va. Apr. 6, 1998). Debtor testified that he used the money to pay his monthly household expenses, thus this factor weighs in favor of Debtor.

Having analyzed each relevant factor regarding Debtor's intent to deceive, this Court finds Debtor lacked the requisite intent to deceive, and Plaintiff failed to meet its burden of proof on this element.

Because this Court finds in favor of Debtor on the first three elements of actual fraud, an analysis of the last two elements regarding justifiable reliance and sustained loss due to misrepresentations is unwarranted.  Therefore, Plaintiff failed to meet its burden of proof that Debtor engaged in fraud in accepting the pre-approved extension of credit and

thus is not entitled to an award of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) on the debts owed to it by Debtor.

## CONCLUSION

The element of risk is inherent in the issuance of credit, and our "credit-card economy" encourages widespread voluntary risk taking on the part of those issuing the credit. *See In re Valdes,* 1995 WL 618998, at *2 (S.D. Fla. Sept. 1, 1995)(*citing First Nat'l Bank v. Roddenberry,* 701 F.2d 927 (11th Cir. 1983)). Issuers of credit are willing to risk non-payment of debts, like this one, because that risk is factored into the finance charges. Because extending credit is a risk that is voluntary and calculated, Section 523(a)(2)(A) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their ability to pay. *Id.*

Acceptance admits it had full access to Debtor's credit report and allegedly considered it in its entirety. Reviewing Debtor's credit report as Acceptance says it did should have disclosed the significant unsecured debt owed to at least twelve other lenders by Debtor. The fact that Acceptance either failed to consider these other debts, or chose to disregard them is extremely troubling. To allow Acceptance to assert in one instance that Debtor's creditworthiness falls within the best of the best, and then later claim that he committed fraud by defaulting on a loan that he was pre-approved for creates an absurd result that is not in keeping with the Code's strict construction of nondischargeability and the debtor's fresh start.

In conclusion, Acceptance Loan is a lending and financing company. Part of Acceptance Loan's business of lending is assuming the risk that its borrowers may default and in some cases my file bankruptcy. Acceptance attenuates this risk by

16
Case 16-00071    Doc 20    Filed 09/15/17    Entered 09/15/17 15:56:38    Desc Main
Document      Page 16 of 17

charging a risk adjusted interest rate. In this case Acceptance's preapproved extension of credit carried with it an interest rate of 25.94%, slightly more than 21 percentage point over the current Prime Rate. While Acceptance attempted to further mitigate that risk by conducting its 24-point credit analysis, that analysis proved incorrect. Allowing Acceptance to use boilerplate language printed on the back of a preapproved check as additional insurance against loss is, without a finding of actual fraud, out of line with the purpose and spirit of the Bankruptcy Code.

      This Court saw no evidence of fraud, actual or otherwise, and thus concludes that Plaintiff failed to meet its burden on the allegations alleged in the Complaint. Debtor is entitled to a judgment in his favor and a finding that his debt to Acceptance Loan is dischargeable. Having adjudicated Plaintiff's Complaint on the merits, and there being no issues remaining for this Court to consider, this matter is due to be and hereby is DISMISSED with prejudice. Judgment in favor of the Debtor.

Dated: September 15, 2017

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE